UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
─────────────────────────────────

UNITED STATES OF AMERICA

        - against -

TED ALBIN,

                Defendant.

─────────────────────────────────

23-cr-664 (JGK)

MEMORANDUM OPINION
AND ORDER

JOHN G. KOELTL, District Judge:

On June 24, 2025, the jury in this case found the defendant, Ted Albin, guilty on all four counts in the superseding indictment: (1) conspiracy to commit health care and wire fraud; (2) health care fraud; (3) wire fraud; and (4) conspiracy to violate the Anti-Kickback Statute ("AKS"). The defendant now moves for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c) and in the alternative for a new trial pursuant to Federal Rule of Criminal Procedure 33. For the reasons explained below, both motions are **denied.**

## I.[1]

On December 15, 2023, the grand jury returned the superseding indictment charging the defendant with four counts: (1) conspiracy to commit health care and wire fraud, in violation of 18 U.S.C. § 1349; (2) health care fraud, 18 U.S.C.

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, citations, footnotes, and internal quotation marks in quoted text.

§§ 1347 & 2; (3) wire fraud, 18 U.S.C. §§ 1343 & 2; and (4) conspiracy, in violation of 18 U.S.C. § 371, to violate the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2). ECF No. 1. The superseding indictment charged that the defendant "engaged in a scheme to buy and sell written orders (also known as 'prescriptions') for durable medical equipment ('DME'), and to assist others in buying and selling such orders, in an effort to fraudulently bill the Medicare Program ('Medicare') for more than approximately $25 million in DME, and to cause more than $9 million to be paid out in such fraudulent claims." Id. ¶ 1.

The trial began on June 9, 2025, with jury selection. On June 24, 2025, the jury returned a verdict of guilty against the defendant on all four counts. The defendant now moves for a judgment of acquittal pursuant to Rule 29 or in the alternative for a new trial pursuant to Rule 33.

**II.**

To succeed on a motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, the defendant must show that no rational trier of fact, viewing the evidence in the light most favorable to the Government, could have found the defendant guilty beyond a reasonable doubt of the essential elements of the crime charged. United States v. Caracappa, 614 F.3d 30, 43 (2d Cir. 2010).

2

In considering the sufficiency of the evidence, the Court must view the evidence presented at trial "in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." United States v. Walker, 191 F.3d 326, 333 (2d Cir. 1999). The Court must analyze the pieces of evidence "not in isolation but in conjunction," United States v. Maldonado-Rivera, 922 F.2d 934, 978 (2d Cir. 1990), and must apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others," United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999).

"[T]o avoid usurping the role of the jury," the Court must "not substitute [its] own determinations of credibility or relative weight of the evidence for that of the jury." United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000). Thus, the Court must "defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence." United States v. Morrison, 153 F.3d 34, 49 (2d Cir. 1998). The jury's verdict "may be based entirely on circumstantial evidence." United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995); see also United States v. Aleskerova, 300 F.3d 286, 292-93 (2d Cir 2002); United States v. Sattar, 395

3

F. Supp. 2d 79, 82-83 (S.D.N.Y. 2005), aff'd sub nom., United States v. Stewart, 590 F.3d 93 (2d Cir. 2009).

### III.

Considering the trial evidence in the light most favorable to the Government, a reasonable jury could have found that the Government established the following facts at trial.

From approximately 2017 through 2021, the defendant engaged in a scheme to submit fraudulent claims to Medicare using his medical billing company, Grapevine. Grapevine's clients were durable medical equipment ("DME") supply companies that provided DME — primarily, orthotic braces — to medical beneficiaries. Trial Tr. ("Tr.") 544-48, 740. Grapevine submitted more than $38 million in fraudulent billing on behalf of its clients, causing Medicare to pay out more than $12 million. Id. at 1427. The defendant was the owner and president of Grapevine; his twin sister, Erin Foley, also worked for Grapevine. Id. at 75, 109-10.

The DME prescriptions that Grapevine eventually submitted to Medicare were fraudulently generated and sold to DME supply companies by "marketing" companies in exchange for cash payments. Id. at 532-33, 1029-31, 1043-45; GX-502. The so-called marketing companies, in reality, did not provide actual marketing services. Tr. 1030-31. Instead, they paid telemedicine companies to have doctors sign medically unnecessary DME

4

prescriptions. Id. at 536-38. The marketing companies would, in turn, sell those prescriptions to DME supply companies, including Grapevine's clients. Id. at 538-39, 1029-30.

The defendant oversaw the submission of Grapevine's clients' claims to Medicare and knew that Grapevine's clients purchased medically unnecessary, fraudulently obtained prescriptions from marketing companies. Id. at 545-49, 757; GX-502. The defendant also knew that the marketing companies paid telemedicine doctors to generate those prescriptions. Tr. at 552-61; GX-502; GX-1202; GX-1209.

In exchange for the fraudulent prescriptions, the defendant, Foley, and Grapevine received commissions on the amounts paid by Medicare to the DME supply companies. Tr. 686, 1031-32. Grapevine processed fraudulent claims on behalf of several DME supply companies. Id. at 1029. The defendant and Foley also owned three of their own DME supply companies. Id. at 1023. Like Grapevine's other clients, the companies owned by the defendant and Foley bought DME prescriptions directly from the marketing companies, despite knowing that those prescriptions were obtained by paying telemedicine doctors. GX-502. The defendant and Foley would then process and submit these fraudulent claims to Medicare through Grapevine. Tr. 547-50, 757.

5

The defendant and Foley knew that the DME prescriptions were fraudulent. Id. at 553-61; GX-502; GX-1202; GX-1209. Multiple Grapevine employees alerted the defendant and Foley to issues with the prescriptions, including that the prescriptions included multiple braces per patient and that the prescriptions lacked supporting medical documentation. Tr. 155-58, 342, 347, 1058-62. Grapevine employees also told the defendant and Foley that the claims submitted by Grapevine were frequently denied and resulted in a high rate of returns. Id. at 126-28, 341-42, 348. Grapevine employees also warned the defendant and Foley that many of the prescriptions were clearly forged or were otherwise fraudulent. Id. at 1050-52.

The defendant and Foley did not investigate these issues. Id. at 168-69, 195, 348, 1052-53, 1069. Instead, they took steps to conceal the fraud. For example, the defendant directed Grapevine employees to stagger the submission of claims across multiple days in order to avoid scrutiny by Medicare. Id. at 129, 191, 1062-64. The defendant and Foley opened multiple DME supply companies to avoid billing too much to a single company; they also took steps to mask their involvement in the DME supply firms that they owned. GX-601-A; GX-602-A; GX-603-A. Finally, when the defendant became aware he was under investigation for Grapevine's billing practices, he took steps to hide his involvement in Grapevine and relied on Foley to act as the

6

public face of the company. GX 202-8073; Tr. 115-16, 337, 777, 1008.

On March 2, 2022, Andrew Parillon, a Grapevine employee who had been approached by federal agents investigating the defendant, made recorded phone calls with the defendant and Foley. On those calls, the defendant and Foley acknowledged that they knew Grapevine submitted prescriptions that the DME supply companies had paid to obtain. GX-503; GX-504. They also instructed Parillon to tell the federal agents falsely that he did not know about the buying and selling of prescriptions by Grapevine's clients. GX-502; GX-503.

Following the recorded calls, the defendant correctly suspected the calls might have been recorded. He then deleted emails and text messages with Foley. GX-211-A; GX-211-B. In text messages to Foley about the recorded calls with Parillon, the defendant said "[t]here was enough in that conversation to equally incriminate us," and "If I go to jail so be it." GX-203-C, GX-203-B.

**IV.**

In support of his Rule 29 motion, the defendant argues that the Government did not meet its burden to prove Count Four,

7

conspiracy, in violation of 18 U.S.C. § 371, to violate the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2).[2]

The defendant further argues that Count Four was critical to the other three counts for which he was found guilty: conspiracy to commit health care fraud and wire fraud (Count One), health care fraud (Count Two), and wire fraud (Count Three). According to the defendant, because the Government did not meet its burden on Count Four, he is entitled to a judgment of acquittal on the remaining three counts. These arguments fail.

**A.**

The jury was instructed that to find the defendant guilty of the conspiracy charged in Count Four, it was required to find beyond a reasonable doubt the elements of a conspiracy in violation of 18 U.S.C. § 371, namely (1) that two or more persons entered the unlawful agreement to violate the Anti-Kickback Statute charged in Count Four of the indictment; (2) that the defendant knowingly and willfully became a member of that conspiracy; (3) that one of the members of the

---

[2] Although the indictment also alleged that an object of the conspiracy was to violate 42 U.S.C. § 1320a-7b(b)(1)(B), the Government only sought to have the jury charged — and the Court only charged — that the object of the conspiracy was to violate § 1320a-7b(b)(2)(B). The (b)(1)(B) subsection generally refers to those who knowingly and willfully solicit or receive the specified unlawful remuneration, while the (b)(2)(B) subjection generally refers to those who knowingly or willfully offer or pay the specified unlawful remuneration.

conspiracy knowingly committed at least one of the overt acts charged in Count Four of the indictment, or one which is substantially the same as one explicitly charged; and (4) that the overt act or acts were committed to further some objective of the conspiracy charged in Count Four of the indictment. Tr. 1795.

The jury was also required to find that the object of the conspiracy was to violate the Anti-Kickback Statute, which the jury was instructed provides as follows:

> Whoever knowingly and willfully offers or pays any remuneration, including any kickback, bribe, or rebate, directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person –
>
> > (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a federal health care program,
>
> shall be guilty of a crime.

Id. at 1799-1800.

The jury was also instructed on the specific elements of a violation of the AKS even though the jury was instructed it may find the defendant guilty of conspiracy even if the substantive crime that was the object of the conspiracy was not actually committed. Id. at 1800. The relevant elements of the section of the Anti-Kickback Statute at issue are: (1) that the defendant paid or offered to pay any payment as a kickback, bribe, or

9

rebate; (2) that one purpose of the payment was to induce the recipient to refer an individual for the furnishing of any item or service; or to purchase, lease, order or arrange for the purchase, order of any item or service; or to recommend the purchase, lease, or order of any item or service; for which payment may be made in whole or in part by a federal health care program, such as Medicare; and (3) that the defendant acted knowingly and willfully.[3] Id. at 1800-01.

First, the defendant argues that the Government proved only that forged signatures were submitted to Medicare, not that the defendant and the other conspirators made payments to influence

---

[3] On the second element, the jury was instructed as follows: "The second element would require the Government to prove beyond a reasonable doubt that the purpose of this payment was to induce the recipient to refer an individual for the furnishing of any item or service; or to purchase, lease, order or arrange for the purchase, lease, or order of any item or service; or to recommend the purchase, lease, or order of any item or service for which payment may be made, in whole or in part, by a federal health care program such as Medicare. In order to prove this element pursuant to Section 1320a-7b(b)(2)(B), the Government would have to establish that the defendant paid or offered to pay the payment in order to induce referrals. That is, the defendant made the payment at least in part with the intent to influence the reason and judgment behind the recipient's patient referral decisions. On the other hand, it is not enough to satisfy this element if you find that the defendant made the payment wholly in return for services the recipient provided, and that the recipient also decided to refer patients to companies owned and controlled by the defendant, his alleged co-conspirators, or both. In connection with this second element, the Government would also be required to prove beyond a reasonable doubt that the item or service was or could have been paid for, in whole or in part, by a federal health care program, such as Medicare." Tr. 1801-02.

a provider's referral decisions. See Mem. of Law in Supp. of Mot. to Set Aside Verdict ("Br.") 2, ECF No. 173. ("[T]he government offered no evidence that any provider was ever paid to prescribe braces they would not otherwise have ordered. To the contrary, its case rested on testimony that many provider signatures were fabricated and that no actual referrals occurred."); see also id. at 8. The defendant is plainly wrong. While Antony Vespucci, one of the marketers who sold prescriptions to Grapevine's clients, testified that some prescriptions were forged, Tr. 515, he also testified that he primarily generated prescriptions by paying telemedicine doctors to sign them, id. at 536-38, 623-24. The defendant is also wrong to suggest that the fraudulently obtained prescriptions were not "referrals." Brian Koch, a Medicare fraud investigator testified that a referral in the context of DME equipment is the written order by a medical provider to supply a patient with a DME product. See Tr. 409-410. The defendant himself referred to those orders for DME as "referrals." GX 202-2985; GX-1209.

Second, and relatedly, the defendant argues that his AKS conviction cannot stand because the Government established only that Grapevine and its clients made payments to marketers, rather than directly to prescribing physicians. See Br. at 8-9 ("[T]he AKS requires intent to induce referrals by transferring remuneration to someone in a position to influence healthcare

11

decisions . . . The government here failed to show that any payment was made to a person in a position to influence healthcare decisions."). The defendant is wrong on this point as well. The AKS proscribes payments made to induce orders for items to be paid by Medicare, whether "directly paid [to] physicians or indirectly paid [to] them through middlemen." United States v. Krikheli, 461 F. App'x 7, 9 (2d Cir. 2012); accord United States v. Krikheli, No. 08-cr-528, 2009 WL 4110306, at *5 (E.D.N.Y. Nov. 24, 2009) ("[A] defendant can violate [the AKS] if he pays a non-decision-maker to offer kickbacks to a decision-maker in exchange for referrals.").

There is ample evidence that the defendant and his co-conspirators made payments, through marketing companies, to telemedicine physicians in exchange for DME referrals or prescriptions. Through the testimony of Antony Vespucci (who owned a marketing company, Unity Medical, and another related company, Chilson Holdings) and Carlos Perez (who owned Bio-Drug, a DME supply company and one of Grapevine's clients), the recorded phone calls between the defendant and Andrew Parillon, and text messages from the defendant, the Government established the existence of a scheme whereby marketing companies would obtain the names of potential Medicare beneficiaries, pay telemedicine doctors to write DME prescriptions for those beneficiaries, and then sell those prescriptions to DME supply

12

companies. Tr. 532-34, 539, 756-59, 1029-30, 1043-45; GX502. The defendant's company, Grapevine, would then submit the prescriptions to Medicare for reimbursement and earn a commission. Tr. 686, 757, 1031-32. The payments to the telemedicine doctors were remuneration for DME prescriptions that were eventually submitted to Medicare for reimbursement and were, at least in part, not for legitimate services.

The defendant plainly had knowledge of the scheme and participated in it both through his ownership of DME supply companies and through Grapevine's processing of claims for Medicare reimbursement. Tr. 553-61, 1023; GX-502; GX-1202; GX-1209. The defendant even appeared to acknowledge the illegality of the scheme but defended Grapevine's participation on the ground that it was the marketers who made the payments to the telemedicine doctors. GX-502.

Third, the defendant argues that the Government failed to prove any overt acts in furtherance of the AKS conspiracy. See Br. 9. However, the Government proved two of the specific overt acts charged in the indictment. At trial, the Court instructed the jury that it was the Government's burden to prove that at least one of the overt acts charged in Count Four of the superseding indictment (or one that was substantially the same) was knowingly committed by at least one of the conspirators at or about the time and place alleged. See Tr. 1796-98. The

13

superseding indictment set forth two overt acts relevant for the

purposes of this motion:

> Paragraph 30(d): On or about August 28, 2019, a Grapevine employee sent an email to a DME supply company in New York, New York (the "Manhattan DME Supplier") and to two persons who ran a business ("Seller Company-1") that repeatedly sold DME orders to the Manhattan DME Supplier, copying ERIN FOLEY and TED ALBIN, the defendants, stating, in substance and in part, that the Manhattan DME Supplier had "paid for 65 good leads with the an *[sic]* agreement to replace any NOGO leads" but had received only 45 good leads, and that Seller Company-1 "still needs to replace 20 leads," which referred to DME orders.

> Paragraph 30(e): On or about December 27, 2019, FOLEY sent an email to the Manhattan DME Supplier, copying two other recipients who regularly sold DME orders, introducing the owner of the Manhattan DME Supplier to one of the other recipients of that email ("Seller-1"). The email informed the owner of the Manhattan DME Supplier that Seller-1 "has orthotic marketing that you may be interested in." In truth and in fact, "marketing" was a code phrase that FOLEY and her co-conspirators regularly used to refer to DME orders.

The Government proved the overt act alleged in paragraph

30(d) by GX-1818. GX-1818 is an email from Andrew Parillon to

Carlos Perez[4] (who owned Bio-Drug, a DME supply company and one

of Grapevine's clients) and two marketers; the defendant and

Foley were copied. See GX-1818. In the email, Parillon explained

that "Bio Drug paid for 65 good leads with . . . an agreement to

replace any NOGO leads. In this case, 65 leads were submitted,

45 leads are goes . . . this means [the marketer] still needs to

replace 20 leads." Id. At trial, the jury also heard testimony

---

[4] Perez testified that he received the email via the address "cordettepharmacy@gmail.com." Tr. 766-67.

from Parillon and Perez that the conspirators used the term "leads" to refer to DME prescriptions. See Tr. 766, 1043.

The Government proved the overt act alleged in paragraph 30(e) by GX-1702. GX-1702 is an email from Foley to Perez, in which Foley introduces Perez to Zachary Seid. See GX-1702. In the email, Foley says that Seid "has orthotic marketing that [Perez] may be interested in." Id. The jury heard testimony from Perez that "orthotic marketing" referred to DME prescriptions that Perez could pay for. Tr. 761. Thus, the jury heard ample evidence from which they could conclude that the Government proved overt acts in furtherance of the AKS conspiracy charged in Count Four.

In sum, the jury heard ample evidence from which it could find the defendant guilty of participating in a conspiracy to violate the AKS. The defendant's Rule 29 motion with respect to Count Four is therefore **denied.**

### B.

The defendant next argues that "because the government expressly tied its theory of health care fraud, wire fraud and conspiracy to commit those offenses to the same alleged AKS violations, acquittal on the remaining counts is also warranted." Br. 10. The defendant contends that "the government's entire case rested on the notion that every payment for a prescription was a kickback in violation of the AKS." Id.

15

But that is not true. The jury heard testimony that various prescriptions submitted to Medicare by Grapevine were not medically necessary, were not supported by adequate documentation, and that many were clearly forged. Tr. 155, 342, 347, 1050-52, 1059-62. The jury also heard testimony that the defendant was aware of these issues but took no steps to rectify them. Tr. 168-69, 195, 1052-53, 1069. The jury thus heard ample evidence that the prescriptions that Grapevine submitted to Medicare were fraudulent for reasons independent of any AKS violation and that the defendant conspired with others to commit health care fraud and wire fraud in furtherance of the scheme to submit such fraudulently obtained prescriptions to Medicare. Thus, contrary to the defendant's contention, his conviction under Counts One through Three was premised on sufficient evidence independent of the AKS conspiracy in Count Four.

Because the defendant has not presented any substantive argument in favor of acquittal on Counts One, Two, and Three, his Rule 29 motion with respect to those counts is **denied.**

**V.**

In the alternative, the defendant moves for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

Rule 33 provides that the trial court may grant a defendant's motion for a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). A court will grant a new

16

trial only "in the most extraordinary circumstances." United States v. Locascio, 6 F.3d 924, 949 (2d Cir. 1993). In evaluating the sufficiency of the evidence for purposes of Rule 33, the Court "must examine the totality of the case. All the facts and circumstances must be taken into account. An objective evaluation is required." United States v. Bell, 584 F.3d 478, 483 (2d Cir. 2009). "There must be a real concern that an innocent person may have been convicted." Id.; see also United States v. Alston, 899 F.3d 135, 146 (2d Cir. 2018) ("[T]he ultimate test for such a motion is whether letting a guilty verdict stand would be a manifest injustice."). Although the court has "broader discretion to grant a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure than to grant a motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure," the Court must nonetheless exercise that discretion "sparingly." Bell, 584 F.3d at 483-84; see also Sattar, 395 F. Supp. 2d at 83.

**VI.**

In support of his Rule 33 motion, the defendant challenges the Government's treatment of evidence related to a prior Department of Justice ("DOJ") investigation (the "Arriva Investigation") into the defendant and Grapevine regarding the billing practices of Arriva Medical LLC ("Arriva"), a Grapevine client.

The Government moved in limine to admit evidence of the Arriva Investigation as direct proof of the crimes alleged, or in the alternative, as evidence admissible pursuant to Federal Rule of Evidence 404(b). ECF No. 92. The defendant moved in limine to preclude such evidence. ECF No. 93. As relevant to this motion, the Court ruled that the defendant's prior testimony given in the Arriva Investigation was admissible as direct evidence going to the defendant's knowledge of Medicare requirements. Final Pre-Trial Conference Tr. 4-6.

During trial, the Government moved to admit a text message sent by the defendant (the "DOJ Text Message") that referred to the fact that the defendant was under investigation by the DOJ. ECF No. 134. The Government argued that the DOJ Text Message was relevant and probative for rebutting the defendant's arguments about his lack of involvement in the conspiracy.[5] See id. at 1. The Court granted the Government's motion, finding that the DOJ Text Message was admissible as direct evidence of the alleged conspiracy. Tr. 1264. The Court concluded that the DOJ Text Message was "relevant to shed light on the defendant's state of mind and to help explain the defendant's actions during the time

---

[5] In its most relevant part, the DOJ Text Message states "when the doj takes off my handcuffs …look out. They are already on me. I spent 5 hours today submitting documents!". GX-202-8073.

18

of the charged conspiracy." Id. at 1265. The Court rejected the defendant's argument that the DOJ Text Message was irrelevant:

> The defendant contends that the defendant was not involved with the various companies. And the government contends that the defendant was involved and attempted to hide his involvement. The jury will have to determine what the evidence shows, but that does not make the government's response to the defendant's argument irrelevant.

Id. at 1265-66.

The defendant argues that the Government overstepped the Court's limitations on the use of evidence related to the Arriva Investigation and, in doing so, made impermissible propensity arguments. But that is not true. The Court carefully limited the use of evidence related to the Arriva Investigation, and the Government stayed within the bounds of the Court's ruling.

On June 20, 2025, pursuant to a stipulation between the parties, the Government introduced both a redacted transcript of the defendant's Arriva Investigation testimony and the DOJ Text Message. Tr. 1504-05. During summations, the Government cited both the DOJ Text Message and the transcript of the defendant's Arriva Investigation testimony in support of two arguments: first, that the defendant had knowledge of Medicare's rules, and second, the defendant's belief that he was under investigation explained why he withdrew from certain public-facing roles of the conspiracy. Tr. 1666-69, 1683-85.

19

With respect to the transcript, only the portions agreed upon by the parties — which covered the defendant's knowledge of Medicare rules — were read into the record. Id. at 1502-20. Thus, the excerpts of the defendant's prior testimony that the jury heard — and the Government's arguments concerning that testimony during its summation — were wholly in-line with the Court's ruling on permissible use of evidence from the Arriva Investigation. See Pre-Trial Conference Tr. 4-6.

In support of his Rule 33 motion, the defendant largely reiterates the arguments he raised (and that the Court rejected) in his original attempt to exclude the DOJ Text Message. See Br. 13 (arguing that statements made about the DOJ Text Message during the Government's summation "had little to do with the charged conduct" and instead "invited the jury to conclude that because Mr. Albin had previously been investigated . . . he must have continued to commit fraud"). The defendant also argues that the Government used the DOJ Text Message during its summation to invoke "incendiary 'handcuffs' imagery" and that the Government relied on "textbook propensity reasoning." Id. at 19-20. In reality, the Government's arguments during its summation regarding the DOJ Text Message were entirely permissible. The Government relied on the DOJ Text Message to rebut the defendant's arguments that he was not involved with the various entities involved in the alleged scheme. Of note, the Government

20

argued that the defendant "was looking forward to when the DOJ took off his proverbial handcuffs so that he would no longer be constrained the way he was while that investigation was ongoing," and that "the answer to why Foley was the public face of Grapevine . . . was because Ted Albin didn't want to draw further attention to himself because he believed the DOJ was already looking at him." Tr. at 1685. These arguments were plainly proper given the Court's prior evidentiary ruling. At the argument on the current motion, defense counsel could not point out how the Government exceeded the limited scope that the Court permitted and the defendant raised no objection to the Government's use of the email in the Government's summation. See Tr. 1684-86.

For these reasons, the defendant's arguments that the Government's use of the Arriva Investigation evidence unfairly prejudiced the defendant are without merit. Moreover, the Government never referred to the details of the investigation, and the defendant did not object to the Government's summation. Because the defendant has failed to show that the evidence of the Arriva Investigation "deprived [him] of a fair trial," United States v. Bermudez, 529 F.3d 158, 165 (2d Cir. 2008), his Rule 33 motion is **denied.**

21

## CONCLUSION

The Court has considered all of the arguments of the parties. To the extent not specifically addressed, the arguments are moot or without merit. For the foregoing reasons, the defendant's motions pursuant to Rule 29 and Rule 33 are **denied.**

The Clerk is respectfully requested to close ECF No. 173.

**SO ORDERED.**
**Dated:    New York, New York**
**          December 3, 2025**

_____
**John G. Koeltl**
**United States District Judge**

22