**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

**- against -**

**TED ALBIN,**

**Defendant.**

**23-cr-664 (JGK)**

**Memorandum Opinion and Order**

**John G. Koeltl, District Judge:**

The defendant, Ted Albin, was convicted on June 24, 2025, of four counts of a superseding indictment charging him with conspiracy to commit health care fraud and wire fraud, in violation of 18 U.S.C. § 1349; health care fraud, in violation of 18 U.S.C. §§ 1347 and 2; wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; and conspiracy to violate the Anti-Kickback Statute, in violation of 18 U.S.C. § 371. All of the counts related to fraud whereby Grapevine Professional Services, Inc. ("Grapevine"), a medical billing company, controlled and operated by Albin and his co-conspirator, Erin Foley, billed Medicare for Durable Medical Equipment ("DME") prescriptions on behalf of their own companies and other companies where the prescriptions had been fraudulently obtained. On March 19, 2026, the defendant was sentenced primarily to 60 months' imprisonment, to be followed by a period of three years' supervised release. The Court reserved the issue of the appropriate amount of restitution, and the parties made subsequent submissions on the amount.[1]

[1] At sentencing on March 19, 2026, the Court deferred the imposition of an order of restitution. See Sentencing Tr. 11, ECF No. 237. ("Because there

## I.

The Mandatory Victims Restitution Act ("MVRA") provides for mandatory restitution by a defendant convicted of a property offense under Title 18, "including any offense committed by fraud or deceit," where "an identifiable victim" has suffered a "pecuniary loss."[2] 18 U.S.C. § 3663A(a)(1), (c)(1)(A)(ii), (c)(1)(B). Under the MVRA, anyone "directly and proximately harmed as a result of the commission of an offense"—including anyone "directly harmed by the defendant's criminal conduct in the course of [a] scheme, conspiracy, or pattern" of criminal activity—is a "victim" entitled to restitution. Id. § 3663A(a)(2).

"In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant."

---

[are] sufficient questions with respect to the amount of restitution and because the defense submission with respect to restitution was submitted only one day before sentencing, the Court will defer the determination of the amount of restitution for at least 60 days. See 18 U.S.C. § 3664(d)(5), which allows deferral for 90 days.") The Supreme Court has held that a district court retains the power to order restitution beyond the 90-day deadline, at least where the court has made clear (as the Court has done in this case) that the court intends to order restitution. Dolan v. United States, 560 U.S. 605, 608 (2010); accord United States v. Pickett, 612 F.3d 147 (2d Cir. 2010) (per curiam). At the Court's request, the parties submitted two sets of supplemental submissions on the issue of restitution, the last of which was filed on July 6, 2026. See Gov't Restitution Ltr., ECF No. 241; Def. Restitution Ltr., ECF No. 236.

[2] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

18 U.S.C. § 3664(f)(1)(A); see United States v. Qurashi, 634 F.3d 699, 702 (2d Cir. 2011). "The primary and overarching goal of the MVRA is to make victims of crime whole, to fully compensate these victims for their losses and to restore these victims to their original state of well-being." Qurashi, 634 F.3d at 703; see United States v. Coriaty, 300 F.3d 244, 253 (2d Cir. 2002) ("statutory focus" of MVRA is "making victims whole"). "[T]he MVRA caps the restitution award at the actual amount of the victim's loss," United States v. Thompson, 792 F.3d 273, 277 (2d Cir. 2015), but "the calculation of these losses need not be mathematically precise," United States v. Rivernider, 828 F.3d 91, 115 (2d Cir. 2016). A district court must make only "a reasonable estimate" of a victim's loss "based on the evidence before it." United States v. Milstein, 481 F.3d 132, 137 (2d Cir. 2007); United States v. Gushlak, 728 F.3d 184, 196 (2d Cir. 2013) ("[A] reasonable approximation will suffice, especially in cases in which an exact dollar amount is inherently incalculable.").

In cases involving Medicare fraud, "restitution applies to any losses that Medicare 'directly' suffered" as a result of a defendant and his co-conspirators' "agreement to accept kickbacks and enable [the] Medicare fraud." United States v. King, 93 F.4th 845, 854 (5th Cir. 2024), cert. denied sub nom. Diggs v. United States, 145 S. Ct. 213 (2024). "Any dispute as to the proper amount or type of restitution shall be resolved by the court by the preponderance of the evidence." 18 U.S.C. § 3664(e).

As the Court of Appeals explained, "[T]he MVRA requires only a reasonable approximation of losses supported by a sound methodology. As

explained by the First Circuit, the preponderance standard must be applied in a practical, common-sense way. So long as the basis for reasonable approximation is at hand, difficulties in achieving exact measurements will not preclude a trial court from ordering restitution." Gushlak, 728 F.3d at 196.

## II.

The Government seeks restitution based on the full amount of the claims paid by Medicare to the ten DME supply companies identified in Government Exhibit 801 (the "Ten DMEs") for the relevant period from 2017 through 2020. There was evidence that Grapevine, Albin's company, was the billing company that submitted claims to Medicare on behalf of the Ten DMEs for which claims were paid during the relevant period. There was persuasive evidence that all of the claims were derived from unlawfully purchased prescriptions, and there was evidence of fraud that permeated the work of Grapevine on behalf of the Ten DMEs.

Of the ten DME suppliers included in the Government's request for restitution, three DME suppliers were controlled by Albin and his sister, Erin Foley: Liberty Bell Medical Supply, Skye Medical Equipment, Inc., and Priority Medical Supply. Trial Tr. 1290. Two of the ten DME suppliers, A&E Medical, Inc., and Modern Medical Equipment, were controlled by Alan Swiss. Id. at 117, 1012. Both Erin Foley and Alan Swiss have pleaded guilty to conspiracy, in violation of 18 U.S.C. § 371, to commit health care fraud, wire fraud, and to violate the Anti-Kickback Statute. Erin Foley agreed to

pay $9,193,944.87 in restitution, and Alan Swiss agreed to pay $6,650,929.76 in restitution. The remaining DME suppliers are Victory Medical Supply LLC, Bio Drug Inc., Cordette Pharmacy, Amerisource Medical Equipment and Supplies, Prescription Connection, and Allied Health Supply. The principals of each of the other DME companies whose Medicare-paid claims are included in the request for restitution, with the exception of Allied Health Supply, have also been convicted for their roles in DME fraud. See Gov't July 6, 2026, Ltr. 2, ECF No. 245.

In the course of briefing the issue of restitution, it came to light that the period originally used by the Government to include Medicare claims filed by Victory Medical Supply was arguably overstated because it continued to October 26, 2020, while Grapevine had ceased to be the biller for Victory in July 2020. While there is an argument that restitution should continue while Victory, a co-conspirator, continued to bill Medicare, see United States v. Smith, 513 F. App'x 43, 45 (2d Cir. 2013); United States v. Zangari, 677 F.3d 86, 96–97 (2d Cir. 2012), a reasonable determination of restitution based on the Government's methodology would limit restitution to the period when Grapevine was the Medicare biller for the ten DME suppliers. The Government thus reasonably proposed that the amounts of restitution in Government Exhibit 801 be reduced to reflect only the approximate value of the payments made by Medicare for claims filed during the period when Grapevine was the biller. This reduced the claimed restitution for Victory from $2,395,563.57 to $1,796,672.68; for Prescription Connection from

$94,328.23 to $47,164.12; and for Bio Drug from $994,381.30 to $357,977.27. These revisions reduce the amount of restitution reasonably sought by the Government to $11,431,438.90.

A revised version of Government Exhibit 801, limited to the amount paid, revised as indicated above, is as follows:

**All DME Claims (Medicare Part B and C)**

| DME Provider | Amount Paid |
|---|---|
| VICTORY MEDICAL SUPPLY LLC | $1,796,672.68 |
| BIO DRUG INC CORDETTE PHARMACY | $357,977.27 |
| A & E MEDICAL INC | $462,676.59 |
| LIBERTY BELL MEDICAL SUPPLY | $426,125.88 |
| SKYE MEDICAL EQUIPMENT INC | $224,588.15 |
| AMERISOURCE MEDICAL EQUIPMENT AND SUPPLIES | $209,962.74 |
| PRESCRIPTION CONNECTION | $47,164.12 |
| PRIORITY MEDICAL SUPPLY | $298,061.16 |
| ALLIED HEALTH SUPPLY | $1,398,996.05 |
| MODERN MEDICAL EQUIPMENT, INC. | $6,209,214.26 |
| | **$11,431,438.90** |

Thus, the Government's reasonable methodology in this case limited restitution to the amounts actually paid by Medicare in response to prescriptions billed by Grapevine for DME on behalf of ten DME companies that obtained prescriptions by fraudulent means, including by paying marketers to obtain prescriptions from telemedicine doctors—prescriptions that often contained unnecessary DME or that were forged. The evidence established that the fraud relating to the payment of Medicare claims by the ten DME suppliers and billed by Grapevine was pervasive.

The defendant has questioned the credibility of the Government witnesses, but the Court found them credible as to the existence of the fraud. In the face of that evidence, the defendant has failed to point to the existence of a single prescription covered by the request for restitution that was not tainted by fraud.

**III.**

Some of the evidence supporting the pervasive nature of the fraud in connection with Grapevine's billing of DME prescriptions for the Ten DMEs is as follows.

**A. Grapevine and the DME Suppliers Priority, Liberty Bell, and Skye**

Andrew Parillon was a human resources and client manager at Grapevine from 2019 to 2020. He testified that Grapevine's clients obtained prescriptions from marketing companies by paying for them, which was a violation of Medicare guidelines. Trial Tr. 1029–31. Parillon understood that Grapevine's clients paid the marketers on a per-prescription basis, and that for any prescriptions sold to a DME company that could not be billed, it was the marketers' responsibility to replace them. Id. at 1043–45; GX-1818. Parillon was concerned about this practice because he understood it to be prohibited. Trial Tr. 1045. Nonetheless, as Parillon testified, all of Grapevine's clients were buying prescriptions from marketing companies. See id. at 1031 ("Q: While you were at Grapevine, how many of its clients were purchasing prescriptions from marketers? A: All of them.").

In a recorded conversation with Albin and Foley, Albin did not deny that marketers were paying for prescriptions. Albin argues that marketers also provide legitimate advertising services, but that does not negate their unlawful services of which Albin was aware. See GX-502-1.

Numerous witnesses, including Parillon and Joann Matson, explained that Priority, Liberty Bell, and Skye were DME companies owned by Albin and Foley. Trial Tr. 193–94, 1023. As reflected in the text messages between Albin, Foley, and their sister Molly Hileman, each of these DMEs bought prescriptions and billed them to Medicare through Grapevine. See GX-202. In addition, Dr. Jeffrey Almand, an orthopedic surgeon from the Mississippi Sports Medicine and Orthopedic Center in Jackson, Mississippi, testified about Medicare claims data reflecting over 200 claims for orthotic braces, ostensibly prescribed by Dr. Almand and his partner, Dr. Robert Mehrle, in 2020 and 2021. See GX-802. The claims data reflected that the claims had been submitted on behalf of Skye, Priority, and Liberty Bell. However, Dr. Almand testified that none of the patients reflected in the claims data had been treated or prescribed braces by him, Dr. Mehrle, or anyone at his medical practice—meaning the prescriptions that were billed were forged or otherwise unauthorized. See Trial Tr. 500–09.

**B. Bio Drug**

Bio Drug was owned by Carlos Perez. Perez testified that Bio Drug was a Grapevine client, and that he generated business for Bio Drug by using

marketing companies "to purchase prescriptions," which he would then bill to Medicare. Id. at 740, 755. Perez paid on a per-prescription basis, typically about $300 per prescription. Id. at 773. Perez would buy prescriptions from five or six marketing companies. Id. at 757. The marketing companies would send the prescriptions purchased by Perez directly to Grapevine, so that Grapevine could bill the claims on Perez's behalf. Id. Perez explained, repeatedly, that the marketing companies that Bio Drug engaged did not provide actual marketing services. Instead, they simply sold prescriptions to Bio Drug. Id. at 758–59, 761, 763, 765–66, 772–73. The marketing companies covered up their fraudulent sale of prescriptions by using the term "marketing" as a code for prescriptions, and by generating invoices reflecting the provision of marketing services that were not actually provided. See GX-1875-A; Trial Tr. 775 ("Q: Did Phoenix provide Bio Drug with advertising, buying media, data management, or any of the services listed in paragraph B? A: No. Q: What, if anything, did Phoenix provide Bio Drug? A: Actual prescriptions for durable medical equipment that I would pay for.").

### C. Allied Health Supply

Allied was a DME company and Grapevine client. Albin completed the Medicare enrollment paperwork for Allied in September 2017. Trial Tr. 418–24, 490; GX-605-A (identifying Albin as Allied's "authorized official"). Shakela Watson, a medical coding professional who worked at Allied in 2018, testified that Allied and Grapevine were located in the same office space, and that

despite being employed by Allied, Watson was supervised by Foley, a Grapevine employee. Trial Tr. 334–36. Watson found the number of denials at Allied to be very high. The reason for the denials, generally, was lack of medical necessity. Id. at 341. For the hundreds of denials Watson reviewed at Allied, she reviewed the prescriptions and other documentation, and she noticed a number of patterns that concerned her. Id. at 343. She saw the same reason for denials—lack of medical necessity—over and over again. Id. at 342. She saw that only a handful of doctors were signing the prescriptions. Id. at 343. She learned that all of the patient consultations were telehealth consultations, rather than in-person consultations. Id. at 343–44. Watson was also perplexed by the lack of medical documentation and volume of braces prescribed to Allied's beneficiaries. Id. at 346–47. She was almost always unable to locate the medical "progress notes" for the denied claims. Id. at 345–46. She did not understand why a single medical patient would "need a back brace, knee brace, [and] ankle brace." Id. at 347. Beneficiaries would call and "yell[]" at her, complaining that they had received multiple braces that their doctor had not prescribed. Id. at 347–48. Watson became so concerned about the business practices at Allied that she left the company, just two months after she started. Id. at 349.

**D. A&E Medical**

A&E Medical was a Grapevine client owned by Alan Swiss. Id. at 112. Matson was a medical billing professional at Grapevine from 2018 to 2019

and was responsible for overseeing the medical billing business for A&E Medical. Id. at 111–12. Matson testified that A&E Medical was obtaining and billing, through Grapevine, "telehealth prescriptions," which Grapevine would receive from marketing companies in a central electronic drop box. Id. at 113, 117–18. Matson understood that the marketing company was supposed to contact a Medicare beneficiary and then connect them with an actual physician over the phone, who would assess whether an orthotic brace was appropriate for the patient. See id. at 117–18. If a prescription was warranted, the marketing company would receive the prescription from the telemedicine doctor and forward it to Grapevine, which would bill the claim on behalf of A&E. Id. at 118–19. Matson grew concerned, however, about the telehealth prescriptions billed by Grapevine, including those for A&E. See id. at 121. She heard complaints from brace recipients that the prescribing physician was not their doctor. Id. at 121. She heard complaints from brace recipients who had not requested braces. See id. at 122. She found that the marketing companies were not providing Grapevine with recordings of patient calls, which would have allowed Grapevine to validate that the prescribed braces had been requested by the patients. Id. at 124, 192. She was alarmed by the "extremely high" rate of customer returns, reflecting the return of unwanted or unneeded braces. See id. at 126–27. And she received instructions from Albin not to bill too many daily claims for A&E. Id. at 129. In addition, Barbara Hines, a 77-year-old woman from the Bronx, testified that she received a box of braces from A&E Medical that she never requested.

Id. at 328–30; GX-803. The defendant contends that Matson was not credible, but her testimony was credible.

**E. Modern Medical Equipment**

As Matson testified, Modern was another DME company run by Alan Swiss and his wife out of the same office as A&E. Trial Tr. 117, 256–57, 951; GX-300. It was also a Grapevine client. GX-847. Bo Moncivais testified that his mother, a 78-year-old woman, received "several boxes" of orthotic braces after receiving cold calls from people asking about whether she had pain. Trial Tr. 50–51, 57. The braces received by Moncivais's mother were from Modern Medical. GX-117; GX-803. In addition, another witness admitted to the Government that he sold back brace prescriptions to Swiss to be billed by both Modern Medical and A&E Medical, and that he sold them for approximately $300 per brace. See 3611-009. Swiss pleaded guilty to conspiracy to commit health care fraud, among other crimes, and agreed to pay $6,650,929.76 in restitution.

**F. Amerisource Medical Equipment and Supplies**

Anthony Vespucci, a marketer, explained that Amerisource was one of the DME suppliers and was owned by Paula Pirone. Trial Tr. 547. Vespucci began illegally selling DME prescriptions at the end of 2017, id. at 513–15, and was introduced to Pirone by Erin Foley in 2019. Id. at 545–47. Vespucci sold prescriptions to Pirone from 2019 to 2021. Id. She was one of his "bigger clients." Id. Vespucci testified that Pirone used Grapevine to submit the

billing for her DME companies, which included Amerisource. Id. Emails received by Vespucci further confirmed that Albin knew that Pirone, a Grapevine client, was paying Vespucci on a per-prescription basis, that Vespucci was required to replace any prescriptions that could not be reimbursed, and that Vespucci's prescriptions were generated by telemedicine companies without regard to medical necessity. Id. at 553–61; GX-1209; GX-1202. In addition, Medicare claims data show that over $2,000 in Medicare claims were submitted for patients ostensibly referred to Amerisource by Dr. Almand or Dr. Mehrle, despite Almand's testimony that such patients had never been seen by his practice. GX-806; Trial Tr. 505–09.

### G. Victory Medical Supply

In addition to testifying about her employment at Allied Health, Shakela Watson also testified that in 2020, after she left Allied, her grandmother, Earthline Smith, received a box containing numerous orthotic braces that Watson's grandmother never requested. Trial Tr. 349–52. The package was sent to Watson's grandmother by Victory Medical Supply. GX-109; GX-606-A.

### H. Prescription Connection

Prescription Connection was a DME supply and marketing company operated by Chris Margait. Text messages introduced at trial show that beginning in the middle of 2019, Albin and Foley regularly paid Margait's

marketing firm, "RX Connection." See, e.g., GX-202 at 1275, 1338, 1353, 1496, 1550, 1648, 1683.

**IV.**

The Court concludes that there was sufficient evidence to show that Albin was liable for a pervasive fraud pursuant to which claims were submitted to Medicare and then paid where the claims were based on prescriptions that were purchased by marketers and other claims that were based on false documentation. The claims were for DME and were submitted by ten DME companies, for three of which Albin was a principal. The principals of nine of the companies, including Albin's co-principal in two of the companies, have pleaded guilty to similar claims of fraud.

The Court has an obligation under the MVRA to "order restitution to each victim in the full amount of each victim's losses as determined by the court." 18 U.S.C. § 3664(f)(1)(A). The determination is made by a preponderance of the evidence. As the Court of Appeals recognized, "ordering restitution requires a delicate balancing of diverse, sometimes incomparable, factors, some of which not only lack certainty, but may indeed be based on mere probabilities, expectations, guesswork, even a 'hunch.'" United States v. James, 151 F.4th 28, 49 (2d Cir. 2025). The Court of Appeals also instructs that while a restitution amount need not be "mathematically precise," and a "reasonable approximation will suffice, especially in cases in which an exact dollar amount is inherently incalculable, the approximation must be

supported by a sound methodology." Id. The Court of Appeals noted that the District Court must employ some "reasonable means" in making the determination. Id. at 48 n.6.

In this case, the defendant urges the Court to follow the result in James. In that case, the Court of Appeals vacated a restitution award of $336,996,416.85 against the owner of a medical billing business who had submitted false claims to insurers. Id. at 35. However, the Court of Appeals faulted the District Court for failing to arrive at a restitution order that reflects a "reasonable approximation of losses" directly and proximately caused by the defendant's fraud. Id. at 49. In particular, the Court of Appeals noted that the District Court failed to separate fraudulent from legitimate revenue based on timing, including fraudulent revenue based on fraud committed after the defendant had already received payment. Id. Moreover, the Government used all payments associated with a certain billing code, despite the fact that the billing code included both legitimate and illegitimate payments. Id.

In this case, with the revisions that the Court has made to the claims for restitution, the claims are limited to the period when Grapevine was the billing agent for each of the Ten DME firms. Moreover, the claimed restitution is sought only for claims from the ten suppliers of DME, and only for DME—not for any other products the companies may have sold. And there was substantial evidence of the billing fraud by Grapevine and some evidence for each of the ten DME firms.

On the other hand, the Government's reliance on United States v. Israilov, No. 24-2356, 2026 WL 1064554 (2d Cir. Apr. 20, 2026), is misplaced. In that case, the defendant pleaded guilty to conspiracy to commit health care fraud and aggravated identity theft in violation of 18 U.S.C. § 371. Id. at *1. The defendant and his co-conspirators owned health care clinics that they were not legally allowed to own. Id. The defendant argued that the amount of the losses should be reduced by the amount of medically necessary procedures that were provided by the clinics. Id. at *2. The Court of Appeals disagreed because the issue was whether, absent the fraud, the insurers would have paid the clinics anything at all. Id. Because the clinics were not legally entitled to receive any income, all of the payments to the clinics would not have been made without the fraud. Id. The same overarching legal issue does not exist in this case, although the argument of a pervasive fraud is similar.

This case is closer to United States v. King, 93 F.4th 845 (5th Cir. 2024). In King, the District Court imposed a restitution order based on the total amount of Medicare payments made to the owners of group homes where the owners solicited or received kickbacks for referring Medicare beneficiaries to a co-defendant physician for treatments that were unnecessary or were not ever provided. Id. at 853–54. The Court of Appeals held that restitution was proper for the total amount of Medicare payment to the owners of the group homes paid to the co-defendant doctor for claims related to the residents of the defendants' group homes where the medical services were fraudulent. Id.

The Court of Appeals explained that the defendants "failed to show that any of the billed medical care was legitimate, and thus did not show that the total billed to Medicare was subject to an offset." Id. The Court approved a restitution award in the total amount Medicare paid to the clinic providing the fraudulent services. So too in this case. In this case, Albin has questioned the credibility of the Government's witnesses but has failed to offer any evidence that any of the thousands of prescriptions that are the basis for the claimed restitution were not in fact the basis of fraud or kickbacks. For all these reasons, the appropriate amount of restitution in this case is $11,431,438.90. The Government has agreed that any order of restitution should be joint and several with the amounts of restitution for Alan Swiss and Erin Foley in this case and with the awards of restitution to the other co-conspirators for the amounts billed through Grapevine.

The Government should submit a proposed order of restitution within twenty-one days. The defendant may respond five days thereafter.

**SO ORDERED.**

**Dated:** **New York, New York**
**September 15, 2026**

**John G. Koeltl**
**United States District Judge**